UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SONIA MORALES DIAZ                              :
                                                :
          Plaintiff,                              :
                                                :      09 CIV 6243 (HB)
     -against-                                 :
                                                :      OPINION&
MICHAEL J. ASTRUE,                              :      ORDER:
COMMISSIONER OF SOCIAL SECURITY,                :
                                                :
          Defendant.                              :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**[*]

      Sonia Morales Diaz ("Plaintiff" or "Diaz") brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and Social Security Income ("SSI"). Plaintiff contends that the Administrative Law Judge ("ALJ") failed to afford proper weight to the treating physician's opinion or perform a function-by-function assessment of her post-injury abilities. Presently before the Court are the parties' cross-motions for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). For the reasons below, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED and the case is REMANDED for rehearing.

## I. Background

**A. Procedural History**

      On June 17, 2003, Diaz filed an application for DIB and SSI, alleging that back injuries she sustained in a car accident rendered her unable to work. The Social Security Administration ("SSA") denied her application on September 2, 2003. Diaz reapplied for benefits and was denied again on March 11, 2004. Diaz timely requested a hearing before an ALJ.

      On August 22, 2005, ALJ Henry Snavely held a hearing at which Diaz, who was represented by counsel, testified. On February 8, 2006, ALJ Snavely opined that Diaz was not

---

[*] Courtney Robbins, a second year law student at New York Law School, and a 2009-2010 intern in my Chambers, and Alexandra N. Rothman, a second year law student at Fordham University School of Law, and a summer 2010 intern, provided substantial assistance in researching and drafting this Opinion.

1

disabled because she retained the residual functional capacity ("RFC")[1] to perform a range of sedentary to light work. Diaz requested review, and the Appeals Council, by an order dated September 2, 2006, vacated the ALJ decision and remanded for further proceedings on the grounds that the ALJ failed to adequately consider the medical testimony from Dr. Ty A. Trudeau, Diaz's chiropracter. The Appeals Council directed the ALJ to "state the weight given to [Dr. Trudeau's] report and the reasons for the weight assigned," and "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." *See* Transcript ("Tr.") 282.

On remand, ALJ Paul A. Heyman, newly assigned to Diaz's case, held a hearing on November 16, 2006. Diaz, again represented by counsel, testified. On October 12, 2007, ALJ Heyman found that Diaz was not disabled during the period of June 2003 to October 2007. This decision became final on May 11, 2009, when the Appeals Council declined Diaz's request for review. Diaz then appealed to this Court.[2]

**B. The Administrative Record**

1. Relevant Non-Medical Evidence

    **a. Diaz's Testimony**

Diaz was born on April 27, 1955 in the Bronx, New York. On June 2, 2003, Diaz, while employed as a case manager with the Center for Drug Free Living in Orlando, Florida, was involved in a car accident, which injured her back such that she has not returned to work. On November 11, 2004, while her application for benefits was on review, Diaz was involved in a second car accident, which "exacerbated" her back pain. Tr. 376. After the second accident, Diaz returned to New York.

Diaz testified at the hearing that she suffered from "lower back" pain that radiated to her legs. Tr. 374. She also experienced neck pain that often led to headaches and blurred vision.

---

[1] Residual functional capacity is an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. It is the most a claimant can still do despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). Residual functional capacity is considered during steps four and five of the sequential analysis. *See* § 416.945(a)(5)(i)-(ii).

[2] On appeal, Plaintiff only seeks benefits for the time period of June 2, 2003 to October 12, 2007, because on November 16, 2009, ALJ Robin J. Arzt issued a Bench Decision granting Plaintiff's renewed claim for benefits. As constrained by Social Security Law, ALJ Arzt found that Plaintiff's disability began on the day after ALJ Heyman's unfavorable decision. (*See* Mem. of Law in Sup. of Plaintiff's Mot. for Judgment on the Pleadings, at n.2)

2

Diaz stated that her current treatment regime of medication and physical therapy had not reduced her pain. In the fifteen-year period before her first car accident, Diaz held jobs as a "case manager, advocate, bilingual counselor, WIC representative, alcohol treatment program assistant and stenographer." Tr. 14. Diaz described her case manager work as a desk job, but noted that "[t]here was also a lot of driving [because she] had to take the clients to their appointments or home visits." Tr. 373. Diaz testified that her back pain precluded her from returning to this work or similar employment. She stated that she "can't even sit by the computer. It's difficult … to sit. The pain just hits in [the] back … ." Tr. 374. The ALJ noted that Diaz "appeared to be in significant discomfort during the hearing." Tr. 14.

Diaz also testified that the car accident reduced her ability to take care of herself. She stated that she lives with her son and his family in a second floor apartment, and while there is no elevator in the building, she does limited walking. Diaz explained that her daughter-in-law did the household vacuuming, sweeping, cooking and shopping. Diaz also noted that she needed her daughter-in-law's assistance to tie her shoes, and found it difficult to put on her pants by herself. When asked to describe her daily routine, Diaz responded, "I lay down. I elevate my legs and I go to my physical therapy. That's about it." Tr. 383. Diaz broke down in tears while testifying and explained, "It's just frustrating. I have never – I have never used drugs, have never drank. I've always took care of myself, took care of my family, and now I'm – I'm useless." Tr. 385.

### b. Chiropractor's Report[3]

In a March 4, 2004 report, Dr. Ty A. Trudeau, a chiropractor from Orlando Neck & Back Center who treated Diaz between November 17, 2003 and January 16, 2004, opined that he did "not feel at this time it would be practical for [Diaz] to return to her work . . . ." Tr. 169. Dr. Trudeau reported that Diaz came into his office complaining of back pain after having gone through unsuccessful physical therapy. Dr. Trudeau ordered a series of lumbar decompression therapy sessions. Ultimately, the sessions were unsuccessful, and Dr. Trudeau diagnosed Diaz with a "permanent impairment to the lumbar spine." Tr. 169. While Dr. Trudeau did not perform a functional capacity evaluation, he opined that Diaz "has been restricted from sitting for more than 20 minutes, standing for more than 20 minutes, and any repetitive bending or

---

[3] A chiropractor's opinion is not a medical opinion. *See Diaz v. Shalala*, 59 F.3d 397, 313 (2d Cir. 1995) ("Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide medical opinions.").

3

twisting. She has been restricted from lifting over 15 pounds." Tr. 169. He requested that Diaz undergo a functional capacity evaluation to quantify her limitations.

### c. Other Non-Medical Evidence in the Record

The record also includes letters from Diaz's niece, friend and sister testifying to her limitations. According to Diaz's niece, Maritza Baez, Diaz could no longer use the walking trail in her community, travel on a long car ride to the beach, or sit through a 90 minute movie without "having to leave and go to her room to lay down on her heat pack and use medication because of chronic back pain." Tr. 295. Diaz's friend, Ileana Solla, described how Diaz could not go for walks or stay standing for long periods of time, and was "always complaining that her back hurts . . . ." Tr. 294. Finally, Diaz's sister, Amelia Morales, explained that Diaz was "unable to work or do the simplest daily things." Tr. 297.

2. Relevant Medical Evidence

The medical evidence in the record includes reports from treating and nontreating sources, as those terms are defined in the regulations. *See* 20 C.F.R. § 404.1502.

### a. Treating Sources

*1. Dr. Miguel Burgos – The July 2003 MRIs*

Dr. Miguel Burgos of Orlando Family Physicians was Diaz's primary care physician at the time of her first car accident. Diaz went to see Dr. Burgos a few days after the first accident because she had "excruciating" back pain. Tr. 155. Dr. Burgos examined Diaz and prescribed pain relieving medication, specifically Tylenol #3, Soma, and Vicodin. Dr. Burgos also ordered an MRI of Diaz's back and suggested that Diaz undergo physical therapy. MRIs taken of Diaz's back on July 10 and 22, 2003, revealed "mild lumbar disc disease." Tr. 156, 154. The doctor who administered these MRIs opined that "surgical intervention" was not warranted, and that physical therapy would "provide the most relief for [Diaz's] discomfort." Tr. 154.

*2. Physicians Injury Care Center, Inc.*

After Diaz's second car accident, Diaz sought medical treatment from Physicians Injury Care Center, Inc., in Orlando, Florida. Diaz met with Dr. J. Cornejo, a doctor in the practice, on December 3, 2004, and complained of "moderately severe constant pain, stiffness and intermittent muscle spasms in the cervicothoracic, lumbrosacral, and left shoulder areas." Tr. 222. These symptoms made it difficult for Diaz to turn her head to the left, bend over and

4

straighten up and raise her arm above her head or behind her bank.  Dr. Cornejo noted that Diaz's neck "show[ed] moderate stiffness" with "muscle tenderness."  Tr. 223.  Dr. Cornejo also noted that Diaz's back showed "lumbar muscle tenderness and tenderness over the lumbosacral joint."  Tr. 223.  Dr. Cornejo ordered electrostimulation and physical therapy.  On May 5, 2005, the date of Diaz's last treatment, Dr. J. Magri, another doctor in the practice, opined that Diaz "continues to slowly improve, with less pain and stiffness and greater mobility in the treated areas, neck and back.  She has now reached maximum medical improvement … Her progress toward recovery has been satisfactory."  Tr. 236.

### *3. Dr. Gerald Farmer – The EMG/Nerve Conduction Study*

From January 27 to July 27, 2005, Diaz sought treatment for her neck pain from Dr. Gerald Farmer of Family Medicine Associates of Metro West in Orlando, Florida.  During Diaz's initial evaluation, Dr. Farmer observed that Diaz "seem[ed] uncomfortable while sitting on the exam table."  Tr. 242.  He noted some "soreness on palpitation of the upper shoulders and the lower back," and opined that Diaz had a "herniated disc."  Tr. 242.  On May 19, 2005, Dr. Farmer sent Diaz for an electromyelogram ("EMG") and nerve conduction study of her back.  The report from those studies revealed "no evidence of lumbar radiculopathy."[4]  Tr. 221.

### *4. Dr. Mark Hill – The July 2006 x-rays and MRIs*

Dr. Mark Hill of Signature Health Center became Diaz's primary physician when she returned to New York in June 2006.  On July 24 and 25, 2006, Dr. Hill sent Diaz for x-rays and an MRI of her back.  The x-rays of Diaz's cervical spine were "grossly unremarkable," Tr. 302, and the x-rays of Diaz's lumbar spine revealed only "degenerative changes."  Tr. 304.  The MRI of Diaz's lumbar spine revealed a "benign appearing Tarlov cyst at S1-S2."  Tr. 305.  In a September 15, 2006 letter, Dr. Hill opined that Diaz was "temporarily disabled."  Tr. 301.

### 5. *Dr. Osafradu Opam*

Between November 10, 2006 and March 2, 2007, Diaz received treatment from Dr. Osafradu Opam, a neurologist at Pambo Medical Neuro-Rehabilitation in New York.  On January 10, 2007, as per the request of ALJ Heyman, Dr. Opam submitted a Musculoskeletal Residual Functional Capacity/Pain Questionnaire regarding Diaz's capabilities.  Dr. Opam diagnosed Diaz with "cervical and lumbarsacral disc syndrome."  Tr. 325.  Specifically, Dr.

---

[4] "Radiculopathy" is any disease or abnormality of the spinal nerve root. *See McDonaugh v. Astrue*, 672 F.Supp.2d 542, 552 n.9 (S.D.N.Y. 2009).

Opam indicated that Diaz could sit and stand for less than two hours in an eight-hour day, and for less than five minutes at a time. He determined that Diaz would need a job that allowed switching positions at will, and that she would miss more than four days of work each month because of her back pain. Dr. Opam opined that Diaz only could walk a half city block a day, could never lift twenty pounds and could not do household chores.

Upon receiving this report, ALJ Heyman requested that Dr. Opam clarify his findings in light of recent medical evidence. In a letter dated March 12, 2007, the ALJ wrote:

> The most recent MRI reports (copies enclosed) suggest that the claimant's cervical and lumbar conditions may have abated. Is that the case? If not, what changes, if any, are indicated in your evaluation of the patient's condition, given the recent MRI reports?

Tr. 287. Dr. Opam reviewed the attached MRI reports, but explained that Diaz had undergone EMGs on January 30, 2007 and February 2, 2007, which revealed abnormalities of the cervical and lumbar parts of the spine. *See* Tr. 290 ("Bilateral C5 and C6 radiculopathy" and "Right L5 and S1 radiculopathy"). Dr. Opam added that when he last saw Diaz on March 2, 2007, she reported "persistent low back pains and stiffness, neck pains that radiate into both shoulders, [and] headaches, off and on." Tr. 290. Dr. Opam observed that Diaz had a limited range of motion in her cervical and lumbar spine. Dr. Opam opined that Diaz had cervicalgia, radiculopathy, lumbarsacral disc syndrome and a Tarlov cyst at S1-S2. Finally, Dr. Opam addressed the discrepancy between his findings and the recent MRIs and explained:

> MRI studies done and repeated from 2003-2007, read by different radiologists, revealed different reports. There is no doubt the lumbarsacral region has disc pathology, reported as dehydration, or herniation, or bulge. One may have to obtain all the films from the different dates and have one neuro-radiologist give a comprehensive report.

Tr. 290.

### b. Nontreating sources

*1. State Agency Medical Consultants*

The record before the ALJ also included reports from two state agency medical consultants, dated August 29, 2003 and March 6, 2004. Both consultants reviewed Diaz's medical records to provide a residual functional capacity opinion to the Commissioner, but neither examined Diaz. The consultants opined that Diaz had a "medically determinable impairment with credible and consistent symptoms." Tr. 165, 210. Despite concurring that there

6

was indeed something medically wrong with Diaz, the consultants checked boxes on the forms to indicate that Diaz could sit, stand, and walk for six hours in an eight-hour workday. The August form indicated that Diaz could frequently lift ten pounds and occasionally lift twenty pounds, while the March form indicated that Diaz could occasionally lift fifty pounds.

### *2. BPS Assessment and November MRI*

The record also included the results from a July 2006 Biopsychosocial ("BPS") assessment[5] and a November 2006 MRI. Diaz underwent the BPS assessment as part of the Wellness, Comprehensive Assessment, Rehabilitation and Employment ("WeCARE") program[6] of the New York City Human Resources Administration ("HRA"). The BPS assessment indicated that Diaz "may perform sedentary work duties with restrictions as detailed." Tr. 354. Specifically, Diaz was restricted from sitting for more than five hours a day, and walking or standing for more than thirty minutes a day. Diaz also could only lift, push, pull, and carry up to five pounds. Finally, on November 8, 2006, an MRI was performed on Diaz's cervical spine. The report on that MRI showed "no demonstrable herniated disc. There is no evidence of spinal stenosis.[7] The spinal cord is normal size, position, and signal intensity. The paravertebral soft tissues are normal. Impression: normal study." Tr. 361.

### C. ALJ Decision

On October 12, 2007, ALJ Heyman denied Diaz's claim for benefits, finding that Diaz was not disabled within the meaning of the Act. Following the five-step process in the SSA regulations, the ALJ stated:

> [Diaz] testified that she is no longer able to perform normal activities of daily living. However, after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce

---

[5] *See Lovely H. v. Eggleston,* 235 F.R.D. 248, 251-52 (S.D.N.Y. 2006) ("The BPS assessment is conducted by a contract vendor and results in a functional capacity outcome and the development of a comprehensive service plan ... for each client. Each client who is classified as 'temporarily unemployable secondary to unstable medical and/or mental health conditions,' 'employable with varying degrees of limitations,' or 'unemployable for 12 months or more,' (i.e., anyone not classified as "fully employable"), and any other persons receiving benefits in conjunction with that client's case (whether or not those additional persons have medical or mental impairments), is eligible to receive his or her public assistance and related services through the WeCARE program.").

[6] *See id.* at 251 ("WeCARE is designed to offer comprehensive and integrated services to public assistance clients who have medical or mental health conditions that may affect their ability to work.").

[7] "Stenosis" is a narrowing of the spinal canal, usually caused by degenerative changes. 5-S Attorneys' Dictionary of Medicine 5209.

> the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent alleged.

Tr. 14. The ALJ found that the objective medical evidence in the record did not support a finding that Diaz was disabled. The ALJ noted:

> An EMG/nerve conduction study, performed on May 19, 2005 found no evidence of lumbar radioculopathy. A more recent MRI studies [sic] of the cervical spine, performed on July 28, 2006, revealed only mild disc dehydration at L4-5 and L5-S1 levels, with no herniations. The cysts were diagnosed as benign Tarlov cysts at S1-2. MRI study of the cervical spine, performed in November 2006 was negative for any abnormalities. Similarly, x-rays of the spine were essentially unremarkable.

Tr. 14.

ALJ Heyman considered the reports from Dr. Trudeau and Dr. Opam that Diaz was disabled, but ultimately rejected their opinions. First, the ALJ disregarded Dr. Trudeau's report because "the chiropractor treated the claimant on only a few occasions … [and] therefore, did not have a long term relationship with the claimant … Also, the chiropractor's assessment … was not supported by any diagnostic assessment in the record." Tr. 13. Further, the ALJ noted that a chiropractor's opinion is only treated as "other evidence" rather than medical evidence. Tr. 14. ALJ Heyman also accorded "limited weight" to the Musculoskeletal Residual Functional Capacity/Pain Questionnaire from Dr. Opam. Tr. 14. The ALJ found Dr. Opam's response to his request for clarification inadequate and explained:

> In his response, the doctor reiterated his earlier findings and did not offer an explanation or support for his conclusion that the claimant is significantly limited in her ability to perform work-related activities. He evaded a direct answer to the question and it may appear that he simply does not know the answer. The undersigned notes that Dr. Opam failed to support his findings with objective medical findings. Furthermore, the doctor's opinion is not supported by the substantial weight of the evidence in the record.

Tr. 14. Ultimately, ALJ Heyman adopted the opinion of the state agency medical consultants, and concluded that Diaz had the "residual functional capacity to perform sedentary to light work, as found by State Agency medical consultants." Tr. 13. The ALJ determined that Diaz had the RFC to perform her "past relevant work," Tr. 14, and therefore Diaz was not disabled.

## II. DISCUSSION

A. **Standard of Review**

In reviewing a decision of the Commissioner, this Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 625 (S.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g) (brackets in original). However, a district court may set aside the "Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This Court is not to substitute its judgment for that of the Commissioner or review the Commissioner's decision *de novo. See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 273 (S.D.N.Y. 2009). While the Commissioner's findings of fact, if supported by substantial evidence, are determinative, an ALJ's incorrect application of the law is a basis for reversal. *See Vella v. Astrue,* 634 F. Supp. 2d 410, 416 (S.D.N.Y. 2009).

C. **Analysis**

1. "Treating Physician" Rule

Plaintiff first argues that the ALJ erred by according "little weight, " Tr. 14, to Dr. Opam's opinion concerning her limitations. Plaintiff claims that, had the ALJ followed the "treating physician" rule, the ALJ would have concluded that Plaintiff's limitations precluded her from performing her previous work. By contrast, the Commissioner claims that the ALJ supported his rejection of Dr. Opam's opinion with substantial evidence, based on the MRI results and contact of Dr. Opam to clarify his medical opinion. Pursuant to the "treating physician" rule, the ALJ must give "controlling weight" to the opinion of a treating physician as to the nature and severity of the impairment so long as the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128 (citing 20 C.F.R. § 404.1527(d)(2)). If an ALJ does not give a treating physician's opinion controlling weight, the

9

ALJ must assess the following factors to determine how much weight to afford that opinion: (1) the length, nature and extent of treatment and the frequency of examination; (2) the relevant evidence presented by the treating source in support of his opinion; (3) whether the opinion is consistent with the record as a whole; (4) whether the treating source is a specialist in the area relating to his opinion; and (5) other factors which tend to support or contradict the opinion. *See Shaw*, 221 F.3d at 134; *Banks v. Astrue*, No. 06-CV-1428 (KMK)(GAY), 2009 WL 2482140, at *6 (S.D.N.Y. Aug. 13, 2009); 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Hallaron*, 362 F.3d at 33) (brackets in original); *see also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give *good reason*s in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion")(emphasis added). The failure to provide "good reasons" is grounds for remand. *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Finally, an ALJ cannot "reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).

Here, the ALJ failed to consider all of the relevant factors when deciding to give Dr. Opam's opinion little weight. The ALJ did not discuss factors such as the length, nature and extent of treatment, whether the treating source is a specialist, or any other relevant factors. *See Banks*, 2009 WL 2482140, at *6 ("[T]he ALJ apparently considered only one of the factors set forth in the regulations . . . [b]ecause the ALJ failed to apply the factors properly, it is impossible to assess whether [the physician's] opinion was properly rejected."). The "ALJ's consideration must be explicit in the record," *Burgin v. Astrue*, 348 Fed. Appx. 646, 649 (2d Cir. 2009), and this is not the case here.

At the same time, it is not clear that the ALJ fully developed the administrative record as required. ALJ Heyman asks Dr. Opam to reconcile his medical opinion with the more recent, normal MRIs. Tr. 287. In response, Dr. Opam explains that "[o]ne may have to obtain all the films from the different dates and have one neuro-radiologist give a comprehensive report." Tr.

10

290.  While an ALJ may reject a treating physician's opinion if he fails to clarify inconsistencies within his opinion, *see Messina v. Astrue*, No. 09 Civ. 2509(SAS), 2009 WL 4930811, at *6 (S.D.N.Y. Dec. 21, 2009) (finding the ALJ properly rejected the treating physician's opinion when the physician did not clarify the inconsistency between *his* records and *his* medical opinion), this situation —where the treating physician's opinion is consistent with his own records— is distinguishable.  Here, Dr. Opam's response about other opinions should have prompted ALJ Heyman to request a comprehensive report as suggested, or at least explain why Dr. Opam's position was so inconsistent with this other evidence that it be rejected.  Again, because the ALJ failed to provide the required "good reasons" for his determinations, this Court cannot be certain that the ALJ's decision is supported by substantial evidence.  Therefore, this Court must remand for a rehearing to consider all of the required factors, and then provide "good reasons" if the determination by the ALJ continues to find that Dr. Opam's opinion is entitled to "little weight."

### 2. Residual Functional Capacity Assessment

Plaintiff also contends that the ALJ erred by failing to provide a function-by-function assessment of her abilities when determining her RFC.  The Commissioner responds that the ALJ incorporated by reference the State Agency medical consultants.  Pursuant to the regulations, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite any impairments.  A claimaint's RFC is determined on a function-by-function basis.  *See* SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The Second Circuit "has not specifically addressed the requirement of a function-by-function assessment" in the ALJ's written decision.  *Messina*, 2009 WL 4930811, at *5 & n.66.  Courts in this district "have reached different conclusions as to whether a function-by-function analysis is required or merely desirable." *Id.* at *5; c*ompare Casino-Ortiz v. Astrue*, No. 06 Civ. 155, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) ("[A]lthough a function-by function analysis is desirable, SSR 96-8p does not require ALJs to produce [ ] a detailed statement in writing."); *Murphy v. Barnhart*, No. 00 Civ. 9621, 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) ("Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis.").  Regardless of whether an express review of each factor must be included, the ALJ must "avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the

evidence supports [his] conclusions, and discussing the claimant's ability to maintain sustained work activity." *Novak*, 2008 WL 2882638, at *3; *see also, Stanton v. Astrue*, No. 09-4088-cv, 2010 WL 1076121, at *2 (2d Cir. Mar. 24, 2010) (assessing whether the ALJ provided a "requisite narrative discussion of RFC").

Without resolving this issue, i.e. whether a written analysis of each function is needed, which ALJ Heyman failed to do, the ALJ also failed to offer any explanation for why he decided that Diaz retained the RFC to perform sedentary to light work.[8] The extent of the ALJ discussion regarding Diaz's RFC is as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary and light work, as found by the State Agency medical consultants. The claimant therefore, retained the residual functional capacity to perform her past work. In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.

Tr. 13. Reliance upon the medical consultants without any specific explanation of how, does not provide sufficient explanation for this Court to determine whether his finding was proper. *See Banks*, 2009 WL 2482140, at *7 (noting that the language "[s]uch conclusion is based in large part on the outpatient treatment notes" did not satisfy an ALJ's "narrative discussion requirement"). This is particularly true where, as happened here, the medical consultants the ALJ relied upon say very little in their charts except for a few vague notations and cursory check marks. *See* Tr. at 161, 206. The ALJ must elaborate upon Diaz's abilities and limitations, so it is clear how he concluded that the RFC was proper. *Cf. Yannone v. Astrue*, No. 06 Civ. 15502 (SCR)(GAY), 2010 WL 743963, at *7 (S.D.N.Y. Mar. 3, 2010). In sum, the ALJ did not satisfy the "narrative discussion" requirement, and as a result, this Court cannot determine if the ALJ's conclusion that Diaz can perform sedentary and light work is supported by substantial evidence.

Finally, while neither party raises this issue, the ALJ also failed to properly assess Diaz's credibility with any specificity, an element most helpful to a reviewing court that does not get to assess the demeanor, etc., of the claimant or for that matter any witnesses. An ALJ may evaluate a claimant's credibility and "arrive at an independent judgment, in light of medical findings and

---

[8] Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools," and "sitting [and] a certain amount of walking and standing." 20 C.F.R. § 404.1567(a). Light work is defined as "lifting no more than twenty pounds at a time with frequent lifting of carrying or objects weighing up to 10 pounds," and "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arms or leg controls." 20 C.F.R. § 404.1567(b).

12

other evidence ... ." *Paradilla v. Apfel*, No. 98 Civ. 5357, 2000 WL 145463, at *6 (S.D.N.Y. Feb. 9. 2000) (citing *McLaughlin v. Secretary of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980)). The ALJ cannot merely conclude that he does not find the claimant credible. *See* SSR 96-7p, 1996 WL 374186, at *4. Here, the ALJ summarized his credibility determination in a single sentence, indicating that Diaz's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent alleged." Tr. 14. This is particularly relevant here where the ALJ noted that Diaz "appeared to be in significant discomfort during the hearing" and there is ample other evidence in the record that she was in substantial pain. Tr. 14. For all these reasons a rehearing is ordered, and at the rehearing, the ALJ is directed to provide a more detailed explanation for any credibility determination, taking into consideration the factors set forth in 20 C.F.R. § 404.1529(c).

### III. CONCLUSION

The Commissioner's motion is DENIED and the case is REMANDED for rehearing pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of this Court is instructed to close this case and remove it from my docket.

**SO ORDERED.**

August 16, 2010
New York, New York

_____
Hon. Harold Baer, Jr.
U.S.D.J.

13